CIACCIO, Judge.
Defendant, City of New Orleans, Department of Health, appeals a decision of the Civil Service Commission which reduced its order of termination to a 60 day suspension. We affirm the decision of the Civil Service Commission.
The sole issue presented is whether the conclusions reached by the Commission were arbitrary and capricious.
The record reveals that the plaintiff was a six year veteran of the Health Department, being employed as an Emergency Medical Technician. Ms. Ellins attended the first paramedic course offered in Louisiana. She passed the National Registry on her first attempt. In addition to her employment with the defendant, Ms. Ellins has taught basic courses in EMT for the past 8 to 9 years at Charity Hospital, Delgado Community College and Tulane University. While with the Police Department, the plaintiff received commendations from her supervisors and the public.
As an employee of the defendant, Ms. Ellins was aware of the March 11, 1986 memorandum circulated from Charity Hospital regarding Emergency Room procedures. The memo provided that:
“All patients transported to Charity Hospital must be first seen and evaluated by the triage nurse. The triage nurse will then determine the appropriate area to send the patient to and indicate so on the appropriate forms. It is not our responsibility to determine where in the ER the patient is to be brought. The only exception to this policy will be those patients in cardiac arrest or critically ill or injury.” (Emphasis Supplied)
Ms. Ellins was also aware of an October, 1985 “Pediatrics ER” policy statement which provided in pertinent part:
2. Any patient suffering from a trauma-related injury, even if there is any question in regards to trauma, should be transported to the accident room. (Emphasis Supplied).
On the date in question, May 24, 1986 at approximately 8 a.m., Amy Ellins and her partner Thomas Quinlin were called to a house located in Uptown New Orleans to render assistance to a young male adult. When the pair arrived at the house they found the patient on the floor of the home and being attended by his mother. The patient reportedly had had several seizures (as many as seven) within a short time period (perhaps an hour). The gentleman had a hemotoma of the forehead from having struck his head on a table. He was mostly unresponsive except to deep pain. He showed only a mild reaction when a large needle was inserted into his arm to start an intravenous drip. The patient thereafter became disoriented and combative. The medical attendants requested police assistance to subdue the patient so that he could be transported to Charity Hospital.
*852 The patient, accompanied by his mother, was transported, Code 2 emergency, to the hospital. Upon arriving at Charity Hospital, the patient in a neck brace and on spine board, was removed from the emergency unit. Dr. Christian Mandry, the physician in charge of the major emergency room that evening, directed the medical attendants to take the patient to the accident room. Following these directives, Ms. El-lins and her partner took the patient past the triage desk to the accident room. Upon passing the desk, Ms. Ellins stated to the nurse “seizure, accident room.” She later testified that she also told the nurse that further information could be provided by the patient’s mother, who had accompanied them to the hospital. No mention of any complaint in procedure was made to the plaintiff at the time of its occurrence.
Following this incident the triage nurse, Gretchen Hempstreet, filed a formal complaint with her superior, Ms. Forsberg, concerning the plaintiff’s actions in bypassing the triage desk. The triage desk is the area where patients are traditionally evaluated by the triage nurse and assigned to a section of the hospital.
On June 6, 1986 Dr. Brobson Lutz, Director of Health, sent a letter to the plaintiff advising her that because of this incident her employment with the defendant was being terminated immediately.
Plaintiff filed a timely appeal of this decision with the Civil Service Commission. In reducing the disciplinary action to a sixty day suspension, the Commission concluded:
The Commission is of the opinion that the appellant thought that she was doing the right thing for her patient although she may have made a misjudgement of the patient’s condition. Even though the appellant’s intentions may be lofty and noble, she must make more determined efforts to follow the rules and procedures set forth by the hospitals involved.
In appealing this decision the defendant contends that the Commission’s actions were arbitrary and capricious. They reason that since the plaintiff’s actions impaired the efficient orderly operation of the public service, her termination should have been upheld.
In order to subject a permanent employee to disciplinary action there must exist legal cause, La. Const. Art. 10 Sec. 8. Martin v. City of St. Martinville, 321 So. 2d 532 (La.App., 3rd Cir., 1975). Repeated improper conduct after lesser disciplinary action has been taken, the totality of individual lesser offenses or even a single particular aggravated incident have all been found to constitute legal cause for dismissal. See: Ryder v. Dept. of Health & Human Resources, 400 So.2d 1123 (La.App., 1st Cir., 1981). The appointing authority must prove, by a preponderance of the evidence, the occurrence of the complained of activity. See: Dale v. French Market Corp., 452 So.2d 1180 (La.App., 4th Cir., 1984). Additionally, the appointing authority must prove that the conduct complained of impaired the efficiency of the public service and that it bears a real and substantial relationship to the efficient operation of the public service in which the employee was engaged. Ryder v. Department of Health & Human Resources, supra; Reboul v. Dept. of Police, 420 So.2d 491 (La.App., 4th Cir., 1982).
Plaintiff contends that the defendant failed to prove that her conduct impaired the efficiency of the public service and that this incident bears a real and substantial relationship to the impairment of public service. We agree.
At the hearing before the Civil Service Commission, Dr. Bronson Lutz, Director of the New Orleans Health Department, testified. He stated that his evaluation of the run sheet indicated to him that the patient was not in “critical” condition when delivered to Charity Hospital. He admitted, however, that he did not know the difference between the term “critically ill” and a “dire medical emergency.” He conceded that a “dire medical emergency” can mean different things to different people. Dr. Lutz stated that the medical emergency personnel in his department had been instructed that when they deliver patients to Charity Hospital that they must follow *853 Charity’s rules. He further stated that the purpose of the triage procedure was to insure that patients were assigned to the correct rooms within the hospital and not unknowingly left waiting in any room without attendance.
Finally, Dr. Lutz testified that he had received several prior complaints about the plaintiff’s behavior, however, he was not specific regarding the incidents. He had warned her that any further infractions could result in her termination. He testified that he had sent her letters on April 23 and May 24, 1986 and he met with the plaintiff June 5, 1986 to discuss her conduct.
Dr. Kenneth Carter, the Medical Director of the Emergency Medical Services, testified that his review of the run sheet indicated that the patient in question was not “critically ill” or injured, he was not in shock, comatose nor semi-conscious. It was Dr. Carter’s opinion that even those persons who were critically ill were to stop at the triage desk. According to Dr. Carter, “dire medical emergency” was a broad unspecific term which indicated that a person needed immediate medical attention. He stated that he would not disagree with an evaluation that a status epilepticus (i.e., one who had had 2 or more seizures without an intervening period of consciousness) would constitute a “dire medical emergency.”
Dr. Carter testified that you must pass the triage desk at Charity in order to go to the accident room. He felt that the plaintiff’s decision not to stop at the triage desk was a mistake in judgment. However, he conceded erring on the side of caution is not a fault in patient care in the field but he specified that an attendant cannot ignore hospital policy and determine on her own where a patient is to be assigned.
Dr. John Litner, Director of Emergency at Hotel Dieu Hospital, disagreed with Dr. Lutz’s and Dr. Carter’s evaluation of the patient in question. In Dr. Litner’s opinion the patient would be classed as a “dire life threatening major medical emergency.” He felt the patient was a status epilepticus with possible major intercranial trauma. He testified that it had been his experience that at Charity Hospital a triage procedure could take from 5 minutes to 2 hours depending upon the number of patients to be processed.
Gretchen Hempstreet, the triage nurse on duty at the time of this incident testified plaintiff passed her desk and stated that the patient was a “seizure patient”. Ms. Hempstreet stated that before she saw the patient he had been directed by a physician to go to the accident room. She felt that the doctor did not have sufficient time to assess the patient’s condition and she would have sent the patient to the major emergency room. Ms. Hempstreet conceded that the triage decision made by the nurse on duty could be overridden by a doctor.
The plaintiff testified that she had once been suspended in October, 1985 for 5 days for being late.
With regard to this incident she related that she had first encountered this patient at 8 a.m. and was told he had seizures from 3 a.m., with between 6 and 7 seizures within the half hour before their arrival. She was also told that the patient had bumped his head. She stated that it was her opinion that the patient was “critically ill or injured” and therefore an exception to the triage process.
Plaintiff testified that the patient was seen by the resident physician in charge and they were directed to the accident room. She stated that she informed the triage desk of the patient’s condition and also indicated that the patient’s mother was present if there were inquiries.
Ms. Ellins was not told of the complaint by triage when it occurred. She did receive a memorandum concerning a phone call by nurse Fosberg on June 2, 1986. She also stated that within a month of the incident she was called to meet with Dr. Lutz.
The testimony of Ms. Ellins concerning the facts surrounding this incident were corroborated by her partner in EMS, Thomas Quinlin.
Considering the testimony elicited at the hearing before the Civil Service Commis *854 sion we find that that body correctly refused to uphold the plaintiff’s termination. The Appointing Authority failed to prove that this plaintiff’s actions on the date in question impaired the efficiency of the public service.
In this case the plaintiff evaluated the patient as being “critically ill or injured” and there is expert medical testimony and literature to support such a position. This evaluation would exempt the patient from the Charity Hospital triage process.
More compelling, however, is a factor which is totally extraneous to the plaintiff’s evaluation (correct or otherwise) of the patient’s condition. In this case, there was a physician evaluation of the patient and a conclusion by a physician that the patient should be taken to the accident room. Even the triage nurse who filed this complaint concedes that a physician evaluated this patient before she saw him. She also admits that an order of a physician regarding evaluation and assignment of a patient can and does override an assessment by a triage nurse.
Under these circumstances the Commission correctly concluded that the Appointing Authority had failed to prove that there was cause for plaintiff’s termination. Such a decision was not arbitrary and capricious and it is fully supported by the record.
In brief, plaintiff alleges that she is entitled to damages for this “frivolous appeal” pursued by the defendant. We are precluded from addressing this issue. Since plaintiff neither filed an appeal nor answered this appeal, the issue she seeks to raise is not properly before us.
For the reasons assigned, the ruling of the Civil Service Commission suspending the plaintiff for a period of sixty days is affirmed. The plaintiff is therefore reinstated with back pay from the effective date of the completion of her suspension, and with retention of all ancillary benefits and status, however subject to a credit and set off for all wages and salaries earned by plaintiff while in private employment during the period of separation following completion of her suspension. La.R.S. 49:113. Defendant shall bear the cost of this appeal.
AFFIRMED.